UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS and VERIZON INVESTMENTS INC., <br><br>　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>THE RESERVE FUND, PRIMARY FUND and RESRV PARTNERS, INC.,<br><br>　　　　　　　Defendants. | Case No.:　　09 CV 2300 (PGG)<br><br>ECF CASE |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

(originally filed in Supreme Court of the State of New York, County of New York / Commercial Division under Index No. 600714/09 on March 9, 2009)

　　　　　　　　　　　　　　　　　　　　　　William H. Pratt
　　　　　　　　　　　　　　　　　　　　　　Joseph Serino, Jr.
　　　　　　　　　　　　　　　　　　　　　　Matthew Solum
　　　　　　　　　　　　　　　　　　　　　　KIRKLAND & ELLIS LLP
　　　　　　　　　　　　　　　　　　　　　　Citigroup Center
　　　　　　　　　　　　　　　　　　　　　　153 East 53rd Street
　　　　　　　　　　　　　　　　　　　　　　New York, New York 10022
　　　　　　　　　　　　　　　　　　　　　　Telephone:  (212) 446-4800
　　　　　　　　　　　　　　　　　　　　　　Facsimile:  (212) 446-6460
　　　　　　　　　　　　　　　　　　　　　　Email:  jserino@kirkland.com
　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiffs Cellco Partnership d/b/a Verizon Wireless and Verizon Investments Inc.*

Dated: March 25, 2009
　　　　New York, New York

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK / COMMERCIAL DIVISION

|  |  |
|---|---|
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS and VERIZON INVESTMENTS INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE RESERVE FUND, PRIMARY FUND and RESRV PARTNERS, INC., <br><br> Defendants. | Index No.:   600714/09 <br><br> I.A.S. PART: <br><br> JUSTICE |

# PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

William H. Pratt
Joseph Serino, Jr.
Matthew Solum
Sandra Lynn Musumeci
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-6460

*Attorneys for Plaintiffs Cellco Partnership d/b/a Verizon Wireless and Verizon Investments Inc.*

Dated: March 9, 2009

## PRELIMINARY STATEMENT

Defendants are wrongfully withholding, refusing to return and now threatening to use for their own purposes more than $90 million of Plaintiffs' funds. Plaintiffs have a rock solid case against Defendants but face the very real and imminent risk that Defendants will not be able to return Plaintiffs' funds once an ultimate judgment is entered against them. To protect against that occurrence and to preserve the *status quo* throughout this action, this Court should enter a preliminary injunction preventing Defendants from using any portion of Plaintiffs' funds for any purpose other than distribution to Plaintiffs.

Defendants operate a money market fund called the Primary Fund, which at one time was one of the largest money market funds in the world with more than $60 billion in assets. Defendants repeatedly touted their successful history as one of the innovators in the money market fund field, as well as their conservative investment policies designed to ensure a stable net asset value, or NAV, of $1.00 per share. Defendants promised prospective investors in the Primary Fund that orders to redeem shares would be promptly honored, with funds returned the very next business day, and that all orders would be paid at the Fund's then-applicable NAV. In reliance on these and other promises, Plaintiffs Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless") and Verizon Investments Inc. ("Verizon Investments") entrusted to Defendants more than $620 million, acquiring more than 620,000,000 shares of the Primary Fund.

As of September 15, 2008, the Primary Fund had invested more than $785 million, or in excess of 1% of the Fund's assets, in Lehman Brothers' commercial paper. According to Defendants, after Lehman Brothers filed for bankruptcy on September 15, the Primary Fund "broke the buck," with its NAV falling below $1.00 at 11:00 a.m. Eastern Time on September 16. Plaintiffs, however, submitted redemption requests for *all* of their shares prior to

10:00 a.m. Eastern Time on September 16, when the Fund's NAV was still $1.00 per share. That fact is undisputed as even Defendants do not, and cannot, deny that the Fund's NAV was indeed $1.00 per share at the time of all of Plaintiffs' redemption requests.

Although Defendants have since returned approximately $530 million of Plaintiffs' more than $620 million investment, Defendants wrongfully continue to withhold more than $90 million of Plaintiffs' funds in violation of their explicit contractual and common law obligations to Plaintiffs. Most recently, on February 26, 2009, Defendants publicly announced their intention not to return the funds but rather to convert them to defray their own expenses and obligations.

Defendants' February 26 announcement not only confirms Defendants' unlawful conversion of Plaintiffs' funds, for which Plaintiffs are seeking redress in this Court in their Verified Complaint filed March 6, 2009, but also signals that Defendants are teetering on the brink of financial insolvency. As such, there is a very real threat that, by the time this Court has an opportunity to decide the merits of this case, Defendants will have completely dissipated Plaintiffs' funds and, accordingly, Plaintiffs will never be made whole. To prevent that gross injustice, Plaintiffs are entitled to the injunctive relief sought herein.

## BACKGROUND

Defendants The Reserve Fund and Resrv Partners operate a money market fund called the Primary Fund, which makes conservative investments and seeks to maintain a stable $1.00 price per share, or NAV. (*See* Verified Complaint dated March 6, 2009 ("Verified Compl.," attached to the Affirmation of Joseph Serino, Jr. dated March 9, 2009 as Exhibit A) at ¶ 1.) The Reserve Fund was hailed as one of the first money market funds, and the Primary Fund boasted of being the third largest such fund in the world with assets of more than $60 billion. (*Id.* at ¶ 13 and Ex. A.)

The Primary Fund is governed by a Prospectus that sets forth the terms pursuant to which investors buy and sell shares and specifies the manner in which investors may redeem shares. (*Id.* at ¶¶ 14, 15.) In relevant part, the Prospectus provides:

> You may redeem your shares on each day that the Funds' [sic] NAV is calculated. Shares will be redeemed at the next NAV determined after a proper redemption request, by telephone or in writing, is received by a Fund or by an authorized financial intermediary. Redemption requests received after the cut-off time for the calculation of a Fund's final NAV on any day will be redeemed at the net asset value calculated on the next business day.

(*Id.* at ¶ 15 and Ex. A at Supplement dated May 21, 2008.) The Prospectus also provides that the amount paid to the investor upon redemption is calculated at the next Primary Fund NAV after the redemption order is received. (*Id.* at ¶ 17 and Ex. A at 16.) The Prospectus sets forth the timing for calculating the Primary Fund's NAV as follows:

> ***Calculation of Net Asset Value.*** Each Fund's NAV is calculated as of its cut-off time for accepting purchase orders and redemption requests (the "cut-off time"). The cut-off times are 8:30 a.m., 9:00 a.m., thereafter hourly up to and including 5:00 p.m. Eastern Time for the Primary Fund . . . .

(*Id.* at ¶ 16 and Ex. A at 16.) The Prospectus further provides that "[p]roceeds from a redemption request will be transmitted to a shareholder no later than the next business day after the receipt of the redemption request in good order." (*Id.* at ¶¶ 18, 39 and Ex. A at Supplement dated May 21, 2008.)

Plaintiffs Verizon Wireless and Verizon Investments accepted Defendants' offer and invested more than $620 million in the Primary Fund, purchasing more than 620,000,000 shares. (*Id.* at ¶ 19.) More specifically, as of the beginning of the day on September 15, 2008, Verizon Wireless owned 597,152,206 Primary Fund shares, valued at more than $597 million, while Verizon Investments owned 22,887,861 shares, valued at more than $22 million. (*Id.* at ¶¶ 19, 20.)

3

On September 15, 2008, Lehman Brothers filed for bankruptcy. (*Id.* at ¶ 21.) At the time, the Primary Fund was holding more than $785 million, or greater than 1% of the Fund's assets, in commercial paper issued by Lehman Brothers. (*Id.* at ¶ 21.) On September 15 – the same day that Lehman Brothers filed for bankruptcy protection – Verizon Wireless submitted to Defendants a redemption request for $65,200,000 in Primary Fund shares. (*Id.* at ¶ 23.) Defendants provided Verizon Wireless with a written confirmation notice acknowledging receipt of the redemption request on September 15, 2008 at 3:47 p.m. (*Id.* at ¶ 23 and Ex. C.) Under the terms of the Prospectus, therefore, Defendants were required to honor Verizon Wireless's September 15, 2008 redemption request at the NAV calculated at 4:00 p.m. Eastern Time on September 15, 2008, which was $1.00. (*Id.* at ¶¶ 24, 25.) Defendants were also obligated to redeem these shares at $1.00 per share no later than September 16, 2008. (*Id.* at ¶¶ 18, 39 and Ex. A at Supplement dated May 21, 2008.)

On September 16, 2008 at 9:10 a.m., Plaintiffs Verizon Wireless and Verizon Investments each submitted to Defendants a redemption request for the remainder of their Primary Fund shares. (*Id.* at ¶ 26.) Defendants have since confirmed in a January 13, 2009 letter that Plaintiffs' September 16, 2008 redemption requests were in fact received at 9:10 a.m. on that day. (*Id.* at ¶ 27 and Ex. D.) Thus, under the terms of the Prospectus, Defendants were required to honor Plaintiffs' September 16, 2008 redemption requests at the NAV calculated at 10:00 a.m. Eastern Time on September 16, 2008, which was $1.00. (*Id.* at ¶¶ 28, 29.) Defendants were also obligated to redeem these shares at $1.00 per share no later than September 17, 2008. (*Id.* at ¶¶ 18, 39 and Ex. A at Supplement dated May 21, 2008.)

Defendants did not redeem Plaintiffs' shares in the Primary Fund in mid-September at any price, much less the promised $1.00 per share. (*Id.* at ¶¶ 39-42.) Instead, the

4

Primary Fund arbitrarily suspended distributions on September 16, 2008. And, although the Defendants have since made a number of varying pronouncements about when the Primary Fund "broke the buck," they have consistently acknowledged – over several months – that the Fund's actual NAV was in fact $1.00 per share at the time of all of Plaintiffs' redemption requests. (*Id.* at ¶¶ 27, 29, 31-38, Ex. D - H.)

Notwithstanding Defendants' admissions in this regard, to date Defendants have returned only approximately 85% of the amounts received from and owed to Plaintiffs. (*Id.* at ¶¶ 40 - 41 and Ex. I, J and K.) As a result, Defendants are still holding more than $90 million of Plaintiffs' funds, including $87 million for Verizon Wireless and more than $3 million for Verizon Investments. (*Id.* at ¶ 42.)

On February 26, Defendants announced their intention to use Plaintiffs' funds for their own benefit. (*Id.* at ¶ 43.) More specifically, Defendants declared their plan to set aside $3.5 billion of the Primary Fund's assets, which include more than $90 million of Plaintiffs' funds, to carve out a "special reserve" that "will be used to satisfy (a) anticipated costs and expenses of the Fund, including legal and accounting fees; (b) pending or threatened claims against the Fund, its officers and Trustees; and (c) claims, including but not limited to claims for indemnification that could be made against Fund assets." (*Id.* at ¶ 44 and Ex. L.)

## ARGUMENT

The standards for a preliminary injunction are well known. Such relief is appropriate where "the movant shows a likelihood of success on the merits, the potential for irreparable injury if the injunction is not granted and a balance of equities in the movant's favor." *Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 234 A.D.2d 200, 201, 651 N.Y.S.2d 504, 505 (1st Dep't 1996) (citing *W.T. Grant Co. v. Srogi*, 52 N.Y.2d 496, 517, 420 N.E.2d 953, 963, 438 N.Y.S.2d 761, 771 (1981)) (additional citations omitted). Plaintiffs easily satisfy these elements.

I.     **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

While Plaintiffs are likely to succeed on all of their causes of action here, this motion focuses on Plaintiffs' contract and conversion claims. Plaintiffs are likely to succeed on their contract claim because Defendants' refusal to redeem Plaintiffs' Primary Fund shares at the agreed-upon NAV of $1.00 per share breaches Defendants' express contractual obligations under the Prospectus. (*See* Section A.) Plaintiffs will likewise prevail on their conversion claim because, for more than five months now, Defendants have wrongfully exercised dominion and control over Plaintiffs' funds. (*See* Section B.)

A.     **Plaintiffs Are Likely to Prevail on Their Breach of Contract Claim.**

To establish a claim for breach of contract, Plaintiffs must show: (a) the existence of a contract; (b) adequate performance of the contract by Plaintiffs; (c) breach of the contract by Defendants; and (d) damages. *See, e.g., Furia v. Furia*, 116 A.D.2d 694, 695, 498 N.Y.S.2d 12, 13 (2d Dep't 1986). All of these elements are met here.

As a threshold matter, the Prospectus constitutes a valid and enforceable contract between Defendants and Plaintiffs. The Prospectus outlines the terms pursuant to which investors, like Plaintiffs, could purchase shares in the Primary Fund. (Verified Compl. at ¶ 14.) The Prospectus clearly and unequivocally sets forth the terms for redemption of shares, including that shares would be redeemed at the next NAV calculated after receipt of a proper redemption order and that such redemption would take place within one business day. (*Id.* at ¶¶ 14 -18, 39.) In reliance on Defendants' representations and promises, Verizon Wireless and Verizon Investments purchased more than 620,000,000 Primary Fund shares at a price of $1.00 per share. (*Id.* at ¶¶ 19, 20.) This created a legal and binding contract. *See, e.g., Caleb & Co. v. E.I. DuPont de Nemours & Co.*, 615 F. Supp. 96, 102-03 (S.D.N.Y. 1985).

The second element of a contract claim is satisfied because Defendants cannot deny that Plaintiffs have adequately performed their obligations under the parties' agreement. (Verified Compl. at ¶ 50.) As for the third element, Defendants cannot seriously dispute that they have breached the promises and obligations embedded in the Prospectus. For instance, although Defendants were obligated under the Prospectus to pay Plaintiffs $1.00 per share, or more than $620 million, for their redemption orders, Defendants have instead paid Plaintiffs approximately $530 million to date. (*Id.* at ¶ 41.) Likewise, while Defendants were obligated by the Prospectus to return Plaintiffs' funds no later than September 17, 2008, it is now March 2009 and Defendants still have not done so. (*Id.* at ¶ 42.)

Finally, the last element of a contract claim is met because Plaintiffs clearly have been damaged as a result of Defendants' breaches. While Plaintiffs are entitled to more than $620 million under the express terms of the Prospectus, Defendants have returned only approximately $530 million, causing Plaintiff to suffer damages in excess of $90 million. Thus, for all of these reasons, Plaintiffs are likely to succeed on their contract claim against Defendants.

### B. Plaintiffs Are Likely to Prevail on Their Conversion Claim.

To state a claim for conversion of funds, Plaintiffs must show (a) legal ownership or an immediate right of possession to specifically-identifiable funds; and (b) that Defendants exercised an unauthorized dominion over such funds to the exclusion of Plaintiffs' rights. *Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 384, 626 N.Y.S.2d 472, 475 (1st Dep't 1995). Plaintiffs easily satisfy this test.

First, it is undisputed that Plaintiffs are the legal owners of the funds in dispute. As of September 15, 2008, Plaintiffs had entrusted to Defendants more than $620 million that was used to acquire more than 620,000,000 Primary Fund shares. (Verified Compl. at ¶¶ 19,

7

20.) There has never been any dispute that Plaintiffs are the rightful owners of those shares, and that those shares were worth in excess of $620 million according to the Primary Fund's NAV at the time of Plaintiffs' redemption orders.

Second, it is uncontroverted that Defendants have exercised unauthorized dominion over Plaintiffs' funds to the exclusion of the Plaintiffs' rights. Indeed, Defendants have failed, since mid-September 2008, to return more than $90 million of Plaintiffs' funds, and Defendants have recently admitted that they now intend to use Plaintiffs' funds for Defendants' own purposes. (*Id.* at ¶¶ 42-44.)

## II.   PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT RELIEF.

Defendants intend to carve-out from the Primary Fund's assets a so-called "special reserve" of $3.5 billion, which includes more than $90 million of Plaintiffs' funds, to subsidize their own obligations. As if that threat is not troubling enough, the very creation of this "special reserve" signals that Defendants lack sufficient assets to meet their obligations. Thus, absent a preliminary injunction preventing Defendants from spending Plaintiffs' funds during this proceeding, there is a very real risk that any final judgment in Plaintiffs' favor will be rendered meaningless and, accordingly, Plaintiffs may never be made whole. Numerous courts have found this type of injury to be irreparable and, thus, worthy of injunctive relief.

For example, in *Zonghetti v. Jeromack*, the Supreme Court granted, and the Appellate Division affirmed, a preliminary injunction preventing the defendant from disposing or transferring assets pending completion of the lawsuit. *Zonghetti v. Jeromack*, 150 A.D.2d 561, 562, 541 N.Y.S.2d 235, 237 (2d Dep't 1989). In *Zonghetti*, the employers brought suit against their former bookkeeper for allegedly making more than $740,000 in unauthorized withdrawals from the employers' checking accounts. *Id.* The employers demonstrated that the bookkeeper was dissipating the employers' funds by purchasing various luxury goods such that "the

8

uncontrolled sale and disposition by the defendants [bookkeepers] of their assets would threaten to render ineffectual any judgment which the plaintiffs might obtain." *Id.* Recognizing that the use of the disputed funds during the pendency of the action could undermine any ultimate judgment or chances of recovery, the Supreme Court granted a preliminary injunction prohibiting the bookkeeper from dissipating assets during the pendency of the case. *Id.* The Appellate Division affirmed. *Id.*

Similarly, in *Pando v. Fernandez*, the plaintiff claimed that he and the defendant had contracted to share any lottery winnings. *Pando v. Fernandez*, 124 A.D.2d 495, 496, 508 N.Y.S.2d 8, 9 (1st Dep't 1986). Plaintiff moved for a preliminary injunction to freeze the lottery amounts pending resolution of the lawsuit. *Id.* After the initial denial of injunctive relief, the plaintiff renewed his application once the defendant actually received a substantial portion of the lottery proceeds. *Id.* Although the Supreme Court again denied the injunction, the Appellate Division reversed, ordering that the lottery proceeds be held pending the litigation in light of its finding that "only if the requested relief is granted will any prize money remain to ensure payment to the plaintiff if he is successful." *Id.*

The Defendants here have openly announced that, absent an order to the contrary, they intend to follow the lead of the defendants in *Zonghetti* and *Pando* by using and dissipating Plaintiffs' funds during the pendency of this action. In that event, like the plaintiffs in *Zonghetti* and *Pando*, it will likely be impossible for Verizon Wireless and Verizon Investments to recover their funds if, and when, this Court concludes that they are entitled to do so. Thus, if left unchecked, Defendants' conduct will undoubtedly cause irreparable injury to Plaintiffs. *Zonghetti v. Jeromack*, 150 A.D.2d at 562, 541 N.Y.S.2d at 237; *Pando v. Fernandez*, 124

A.D.2d at 496, 508 N.Y.S.2d at 9; *see also Interfaith Medical Center v. Shahzad*, 124 A.D.2d 557, 558-59, 507 N.Y.S.2d 702, 703-04 (2d Dep't 1986).

### III. THE EQUITIES FAVOR AN INJUNCTION TO PRESERVE THE *STATUS QUO*.

A balancing of the equities clearly weighs in favor of injunctive relief. Upon the grant of such relief, Plaintiffs' more than $90 million would be preserved until such time as this Court can determine the rightful owner of those funds. Conversely, the only "harm" to Defendants associated with the grant of an injunction is that they may have to honor their obligations to Plaintiffs and not use Plaintiffs' funds to pay their own bills. That, of course, is no "harm" at all. Moreover, if the injunction issues, it would not preclude Defendants from accessing other resources at their disposal for their expenses and liabilities.

By contrast, absent an injunction, Plaintiffs will suffer irreparable harm. If an injunction is not entered, Defendants will use Plaintiffs' funds for Defendants' own benefit, thereby (a) threatening Plaintiffs' ability to ever be made whole and (b) undermining this Court's interest in seeing its final judgments enforced. To permit Defendants, who have no proper claim to these funds, to use and dissipate Plaintiffs' funds for their own benefit and at the expense of Plaintiffs, at the very same time that the matter is being reviewed and resolved by this Court, would be a gross injustice. Accordingly, by any measure, a balancing of the hardships clearly weighs in favor of a grant of a preliminary injunction to maintain the *status quo* pending resolution of this matter. *Witham v. VFinance Invs., Inc.*, 52 A.D.3d 403, 403, 860 N.Y.S.2d 98, 99 (1st Dep't 2008) (granting injunction to prevent sale of disputed securities in recognition of fact that "the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief."); *Ying Fung Moy v. Hohi Umeki*, 10 A.D.3d 604, 604, 781 N.Y.S.2d 684, 686 (2d Dep't 2004) ("[t]he purpose of a preliminary injunction is to maintain the status quo and prevent the dissipation of property that could render a judgment ineffectual.")

## CONCLUSION

Plaintiffs Verizon Wireless and Verizon Investments are entitled to an order enjoining Defendants The Reserve Fund, the Primary Fund, and Resrv Partners, Inc. from using for their own purposes, or disbursing to anyone other than Plaintiffs, any part of Plaintiffs' more than $90 million in funds during the pendency of this litigation.

Dated: March 9, 2009

William H. Pratt
Joseph Serino, Jr.
Matthew Solum
Sandra Lynn Musumeci
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Telephone: (212) 446-4800
Facsimile : (212) 446-6460

*Attorneys for Plaintiffs Cellco Partnership d/b/a Verizon Wireless and Verizon Investments Inc.*